UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT A. CHIULLI, JR, | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No: 10-10488 (JLT) |
| NEWBURY FINE DINING, INC., | ) | |
| d/b/a SONSIE, THE LYONS GROUP, LTD., | ) | |
| GARRETT BURGESS, aka GARRETT | ) | |
| REASE, JEFFREY REIMAN AND | ) | |
| VICTOR TORZA | ) | |
|     Defendants | ) | |

## DEFENDANTS, NEWBURY FINE DINING, INC.  AND LYONS GROUP, LTD.'S, MOTION FOR NEW TRIAL AND MEMORANDUM OF LAW IN SUPPORT THEREOF [LEAVE TO FILE EXCESS PAGES GRANTED ON 12/17/12]

Now come the Defendants, Newbury Fine Dining, Inc., d/b/a Sonsie, and Lyons Group, Ltd. (hereinafter "Defendants"), pursuant to Fed.R.Civ.P. 59, and respectfully request this Honorable Court grant the Defendants a new trial.

As more fully set forth in below, the Defendants are entitled to a new trial because there was no legally sufficient evidentiary basis for the jury to find as it did and the verdict was contrary to the clear weight of the evidence.  To allow the verdict to stand would result in a miscarriage of justice.  A new trial is warranted for eight distinct reasons, each summarized below and addressed in detail in the argument section.

First, the verdict finding the Plaintiff only 5% comparatively negligent, where the undisputed evidence at trial was that he was injured only after he made a conscious decision to engage in a fight, voluntarily threw a punch, and was not an innocent bystander or victim, is clearly against the weight of the evidence.

Secondly, there was insufficient evidence that Lyons Group, Ltd. had control over the operations at Sonsie or was responsible for managing and/or training staff employed

by Newbury Fine Dining, Inc. at Sonsie to warrant Lyons Group, Ltd. being a named Defendant in this action.  Further, the Defendants maintain Lyons Group, Ltd. owed no duty to the Plaintiff and thus was not legally responsible for his injuries.  Moreover, there was insufficient evidence either Lyons Group, Ltd. or Newbury Fine Dining, Inc. had reasonable notice and a reasonable opportunity to avert any reasonably foreseeable harm to the Plaintiff.

Third, much of the Plaintiff's presentation of evidence against the Defendants was erroneously premised on violations of the Massachusetts Alcoholic Beverage Control Commission and the City of Boston Liquor Licensing Board regulations pertaining to the service of alcohol, despite the fact that negligent service of alcohol was not a part of this case as all claims related to negligent service of alcohol in this action were dismissed on summary judgment.

Fourth, throughout trial Plaintiff's counsel engaged in persistent and unduly prejudicial inflammatory comments and lines of examination, which went uninterrupted by the Court and substantially prejudiced the Defendants including: (1) multiple references to alleged drug use by patrons at Sonsie and the tipping of Sonsie staff in cocaine; (2) the alleged non-production of an incident report purportedly in order to conceal evidence by the Defendants; and (3) the Plaintiff's improper closing argument in which he made numerous falsehoods and improper statements and the Court's refusal to provide any relief or make curative instructions as to all of these inflammatory comments.

Fifth, the Court improperly allowed, over the Defendants' opposition, the Plaintiff's Motion to Preclude evidence of the federal, felony convictions of Joseph

Citino, a key witness for the Plaintiff.  Mr. Citino's convictions were for transfer and delivery of counterfeit money and sale of stolen firearms and aiding and abetting the sale of stolen firearms and were directly related to his character for truthfulness.

Sixth, the Court improperly denied the Defendants' request for a negative inference instruction to the jury after Plaintiff's counsel's destruction of evidence he used to prepare two material witnesses for their depositions.

Seventh, the Court improperly permitted the Plaintiff's vocational expert, William Burke, to testify concerning his "Life Care Plan" and improperly admitted the "Life Care Plan" into evidence over the Defendants' objection, where Mr. Burke is not a medical doctor and he prepared the "Life Care Plan" without the consultation of any medical doctors.  The Court improperly rejected the Defendants' objections that Mr. Burke was not qualified to render opinions as to the Plaintiff's future medical needs.

Lastly, the Court improperly permitted the defense economist, Dr. Harold Peterson, to be cross-examined by Plaintiff's counsel using a document not in evidence, which was improperly displayed to the jury on the document projector and inadequately addressed by the Court in its curative instruction to the jury.  Further, the Plaintiff's cross-examination of Dr. Peterson, left the jury with the impression that the approach Dr. Peterson had utilized to calculate the Plaintiff's future loss of earnings was outlawed by a 1915 SJC decision.  However, a full reading of the 1915 case makes it abundantly clear that the excerpt from the case cited in Dr. Hewins' report and shown to the jury presented only half of the guidance offered by the SJC.  Accordingly, the jury was left with an incomplete depiction of the law and the Defendants' request to strike this portion of the improper cross-examination of Dr. Peterson was improperly denied by the Court.

In further support hereof the Defendants state as follows:

## I.  LEGAL STANDARD FOR MOTION FOR A NEW TRIAL.

Under Rule 59 of the Federal Rules of Civil Procedure, following a jury trial, any party may move for a new trial "for any of the reasons for which a new trial has heretofore been granted in action as law in federal court."  Fed.R.Civ.P. 59(a)(1)(A).  As the Supreme Court stated:

> The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (U.S. 1940)

The Rule is broadly stated to include, among general grounds for obtaining a new trial, "… that for other reasons the trial was not fair, and that the motion may also raise questions of law arising out of substantial errors in the admission or rejection of evidence or the giving or refusal of instructions."  11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2805, p. 54 (1995).  "Evidentiary rulings in the admission or exclusion of evidence provide basis for a new trial."  *McKeown v. Woods Hole*, 9 F.Supp.2d 32, 38 (D. Mass. 1998).

A motion for a new trial requires a finding that "the verdict is so seriously mistaken, so clearly against the law or the evidence, as to constitute a miscarriage of justice." *Transamerica Premier Ins. v. Ober*, 107 F.3d 925, 929 (1st Cir. 1997) (internal quotation marks omitted).  A jury verdict should be set aside to prevent a miscarriage of justice. *Kearns v. Keystone Shipping Co.*, 863 F.2d 177, 181 (1st Cir. 1988).  "A verdict may be set aside and new trial ordered when the verdict is against the clear weight of the

evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice." *Ahern v. Scholz*, 85 F.3d 774, 780 (1st Cir. 1996) (internal quotation marks omitted).

An erroneous evidentiary ruling at trial that affects a party's substantial right warrants a new trial. *See Espeaignnette v. Gene Tierney Co., Inc.*, 43 F.3d 1, 9 (1st Cir. 1994) (vacating judgment and remanding for new trial because evidence was improperly excluded); *Swajian v. General Motors Corp.*, 916 F.2d 31, 35 (1st Cir. 1990) (same). In determining whether an evidentiary ruling affected a party's substantial right, "the central question is whether the court can say with fair assurance… that the judgment was not substantially swayed by the error." *Lubanski v. Coleco Indus., Inc.*, 929 F.2d 42, 46 (1st Cir. 1991).

## II.   ARGUMENT

### A.   The Jury's Finding Of Only 5% Comparative Negligence Against the Plaintiff Is Against The Clear Weight Of The Evidence Presented At Trial.

The jury's determination that the Plaintiff was only 5% comparatively negligent in bringing about his injuries is wholly unsupported by the record and against the clear weight of the evidence in this matter, representing a miscarriage of justice.

A court may grant a new trial under Rule 59 when the jury's verdict is "against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." *Johnson v. Spencer Press of Maine, Inc*., 364 F.3d 368, 375 (1st Cir. 2004) (quoting *Ramos v. Davis & Geck, Inc.*, 167 F.3d 727, 731 (1st Cir. 1999)). This standard is less stringent than the standard for granting judgment as a matter of law under Rule 50. *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 104 (1st Cir. 2006); see also

9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2531 (3d ed. 2008).  "[O]n a motion for a new trial -- unlike a motion for a judgment as a matter of law -- the judge may set aside the verdict even though there is substantial evidence to support it." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2806, at 65 (2d ed. 1995); accord *Lama v. Borras*, 16 F.3d 473, 477 (1st Cir. 1994).  Likewise, in a new trial motion, a court "is not required to take that view of the evidence most favorable to the verdict-winner," as in motions for judgment as a matter of law.  *Fine v. Sovereign Bank*, 671 F. Supp. 2d 219, 224 (D. Mass. 2009) citing 11 *Wright, Miller & Kane, supra*, § 2806, at 65-66.  While the court, of course, should give due respect to "the collective wisdom of the jury," *Wright, Miller & Kane*. at 74, if after reviewing all of the evidence the court "is left with the definite and firm conviction that a mistake has been committed," it should grant a request for a new trial.  *Fine* at 224, citing *Wright, Miller & Kane*, at 75.

The clear weight of the evidence submitted at the trial of this matter demonstrated that a finding of 5% comparative negligence on the part of the Plaintiff is in stark contrast to the evidence submitted.  There exists clear, independent evidence of the events leading up to the Plaintiff's injuries, demonstrating that Robert Chiulli voluntarily placed himself in harm's way and voluntarily threw a punch – described by independent witness, Andrew Owens, and by Garrett Rease, as the first punch – as a result of which he was punched once by Garrett Rease and became injured.

The surveillance footage from inside Sonsie presents a clear depiction that at approximately 12:39 a.m. Jeffrey Reiman proceeded towards the front door of Sonsie, and on his way out, he and Rob Delisseo engaged in some "trash talking."  Reiman

walked out and Plaintiff's group, including Robert Chiulli in the lead, immediately followed him out.  The manager also proceeded outside; however, Plaintiff and his group rushed past him.  Upon leaving Sonsie, and after being approached by Victor Torza and Garrett Rease, it was Robert Chiulli who threw the first punch in the fight that gave rise to his injuries, as corroborated by the trial testimony of Andrew Owens, the independent witness who while standing outside of Sonsie and witnessed the altercation, and who is not affiliated in any way with any party to this action.

Even the testimony of Joseph Citino, one of Plaintiff's friends who was with the Plaintiff at the time of the fight, testified to a sequence of events that demonstrates Plaintiff threw a punch.  Where the Plaintiff was voluntarily engaged in conduct on the sidewalk down the street from Sonsie, undertaking the acts that definitively started the subject physical altercation, and was thus, not, in the exercise of due care for his own safety, it would be a miscarriage of justice for a verdict to be upheld finding that the Plaintiff was only 5% at fault.

Throughout trial the Plaintiff proceeded with the theory that Mr. Reiman was the instigator and cause of animosity that ultimately lead to the fight in which the Plaintiff was injured.  Notwithstanding this theory, the jury ultimately found Mr. Reiman 0% at fault of the Plaintiff's injuries.  There is a gross inconsistency and disconnect between the evidence of Mr. Reiman's role on the night in question, as the aggressor, and the jury's ultimate finding of no liability as to him.  This disconnect further evidences the fact that the jury's allocation of negligence, including finding the Plaintiff only 5% at fault, is wholly unsupported by the evidence.

The Defendants respectfully request the Court grant a new trial so to prevent a miscarriage of justice, as described above.

   **B.  There Was Insufficient Evidence That Lyons Group, Ltd. Had Control Over The Operations Of Sonsie And That Lyons Group, Ltd. Was Responsible For Managing and/or Training the Staff At Sonsie; That Lyons Group, Ltd. Owed A Legal Duty To The Plaintiff; Or That Lyons Group, Ltd. Or Newbury Fine Dining, Inc. Had Reasonable Notice And A Reasonable Opportunity To Prevent Foreseeable Harm To The Plaintiff.**

There was insufficient evidence that Lyons Group, Ltd. had control over the operations at Sonsie or was responsible for managing and/or training staff employed by Newbury Fine Dining, Inc. at Sonsie to warrant Lyons Group., Ltd. being a named Defendant in this action.  Further, the Defendants maintain Lyons Group, Ltd. owed no duty to the Plaintiff and thus was not legally responsible for his injuries.  Moreover, there was insufficient evidence either Lyons Group, Ltd. or Newbury Fine Dining, Inc. had reasonable notice and a reasonable opportunity to avert any reasonably foreseeable harm to the Plaintiff.  The Defendants hereby renew and incorporate by reference herein their arguments made in their Renewed Motion for Judgment as a Matter of Law.  (See Doc. No. 250, filed 12/19/12).

   i.  *There Was Insufficient Evidence That Lyons Group, Ltd. Had Control Over The Operations Of Sonsie.*

The Defendants maintain there was insufficient evidence that Lyons Group, Ltd. had control over the operations of Sonsie because at best, the Plaintiff only adduced evidence that the Lyons Group, Ltd. provided certain "back of the house" services to Newbury Fine Dining, Inc. as well as certain other establishments.  However, the Plaintiff must prove more to demonstrate Lyons Group, Ltd. had control over any significant aspect of the operations of Sonsie.

That Lyons Group, Ltd., as a separate corporation, may have provided, on a fee basis, certain administrative services to Newbury Fine Dining, Inc., the corporation that actually ran Sonsie, does not mean that Lyons Group, Ltd. controlled Sonsie's operation. There was no evidence that Lyons Group, Ltd. hired Sonsie staff, ordered its food and supplies, ordered its liquor supplies, or that Lyons Group, Ltd. had an ownership interest in Newbury Fine Dining, Inc. or Sonsie and/or that Lyons Group, Ltd. performed any of the day-to-day functions normally associated with operating a restaurant.  "Control" over an establishment such as Sonsie required a showing by the Plaintiff of more than just the provision of just these selected administrative functions.

ii. _There Was Insufficient Evidence That Lyons Group, Ltd. Was Responsible For Managing And/Or Training The Staff Employed By Newbury Fine Dining, Inc_

There was not one scintilla of evidence that the corporation known as Lyons Group, Ltd. was responsible for managing or training staff at Sonsie with respect to security and patron safety and, thus Lyons Group, Ltd. is entitled to a new trial.  The Plaintiff introduced insufficient evidence of control over the operation of Sonsie by the Lyons Group, Ltd. and, thus, did not establish that Lyons Group, Ltd. had any duty to provide security at Sonsie on June 19-20, 2008.  As the testimony at trial made clear, all training and management at Sonsie was done on-site at Sonsie, daily, by employees of Newbury Fine Dining, Inc.  Lyons Group, Ltd. had absolutely no role in training or management of the staff of Newbury Fine Dining, Inc.

iii. _Lyons Group, Ltd. Owed No Duty To The Plaintiff Thus Was Not Legally Responsible for His Injuries._

There was no evidence that the Plaintiff and Lyons Group, Ltd. had any particular or special relationship which would give rise to a duty on the part of Lyons Group, Ltd.

in order to sustain the Plaintiff's *prima facie* case of negligence against Lyons Group, Ltd.  The overwhelming testimony at trial was that Lyons Group, Ltd. is a separate company, which provided administrative services such as payroll and accounting to Newbury Fine Dining, Inc. for a fee.  Lyons Group, Ltd. did not operate, own, manage or control Sonsie.  Moreover, Lyons Group, Ltd. was not involved with developing or training any security policies and/or procedures which were in effect in June, 2008 at Sonsie.  Since Lyons Group, Ltd. did not manage or operate Sonsie and did not devise any training or security measures or plans, the Defendant owed no duty to the Plaintiff.  For legitimate administrative and tax reasons, Sonsie was operated not by Lyons Group, Ltd., but by Newbury Fine Dining, Inc., a separate and distinct corporation registered with the Massachusetts Secretary of State.  There is no reason, based on the Plaintiff's evidence, to disregard that corporate distinction.  The Plaintiff did not seek to pierce any corporate veil so the distinct corporate forms of Newbury Fine Dining, Inc. and the Lyons Group, Ltd. should not have been blurred or disregarded.

The Plaintiff completely failed to establish that a duty was owed to him by Lyons Group, Ltd., which was an essential element of his claim and therefore Lyons Group, Ltd. was not a proper Defendant and a new trial is warranted.

> iv. _There Is Insufficient Evidence That Either Newbury Fine Dining, Inc., or Lyons Group, Ltd. Had Reasonable Notice Of And A Reasonable Opportunity To Avert Any Reasonably Foreseeable Harm To The Plaintiff._

A restaurant owes a duty of reasonable care to prevent foreseeable harm to its patrons while they are patrons or as they are leaving the Restaurant.  However, a restaurant owner's duty to its patrons arises only when it reasonably could foresee that it would be expected to take affirmative action to protect its patrons and could anticipate

harm to the patrons from the failure to do so and has a reasonable opportunity to do so.

*Barry v. Beverly Enterprises-Massachusetts, Inc.*, 418 Mass. 590 (1994); *Pucci v.*

*Amherst Restaurant Enterprises, Inc.*, 33 Mass. App. Ct. 779, 782 (1992).

The evidence was clear and uncontested that at no time while he was a patron of

Sonsie on the night in question was the Plaintiff involved in any way with Messrs.

Reiman, Torza, and Rease.  He was not a target of any alleged threats made by Mr.

Reiman either around the time of the initial argument about the seat or 30 minutes later

when Mr. Reiman was leaving Sonsie.  The initial verbal confrontation with Mr. Reiman

did not involve the Plaintiff, and the testimony at trial demonstrated clearly that all

parties, including the Plaintiff's companions, believed the confrontation and hostilities

had ended once Mr. Reiman was moved to the other end of the bar.  The Plaintiff was at

no time harassed while a patron of Sonsie and was in no way involved in any

confrontation of any kind with Mr. Reiman or his companions while inside Sonsie.  The

video tape surveillance, as well, amply demonstrated that no hostilities of any kind

between Mr. Reiman and the Plaintiff's companions continued once Mr. Reiman was

moved to a seat at the other end of the bar. Accordingly, for the 26 plus minutes that

elapsed after Mr. Reiman agreed to move his seat, until he began to leave at the end of

the night, no indications existed that should have put the Defendant on notice that there

was any likelihood of further confrontation between the parties and certainly nothing

involving the Plaintiff.

When Rob Delisseo and Mr. Reiman did exchange further words at the end of the

night, as Mr. Reiman was leaving Sonsie, those remarks were a sudden and unexpected

re-ignition of hostilities that had been quelled almost 30 minutes earlier.  Further, that re-

ignition, when viewed in real time, was fast moving, depriving Sonsie staff of any

reasonable opportunity to take action in time to prevent the subsequent harm.

**C. The Court's Instruction To The Jury Concerning The Effect Of Finding That State Or Municipal Regulations Was Violated By Defendants Failed To Make Clear That Such A Finding Did Not, By Itself, Determine Whether The Plaintiff's Negligence Count Had Been Proven.**

The instruction given to the jury concerning the effect of finding that a state or

municipal regulation was violated was unclear, confusing, and left the jury with the

impression that Plaintiff had proven a claim for negligence against the Defendants if the

jury found that such a regulation had been violated.  Accordingly, the Defendants have

been prejudiced and a new trial should be granted.

On this issue, the Court instructed the jury as follows:

A violation of a statute, ordinance, or regulation, although not conclusive, is evidence of negligence on the part of the violators as to all consequences that the statute, ordinance, or regulation was intended to prevent.

The Plaintiff's attorney made the purported violation of state and municipal

regulations by the Defendants the lynch pin of Plaintiff's case, visiting this subject

thoroughly with every employee of Newbury Fine Dining, Inc. and Lyons Group, Ltd.

who was called to testify at trial, as well as with Plaintiff's liability expert.  The Plaintiff

placed substantial emphasis on this issue in both his opening and closing statements.  The

jury was therefore left having spent a large amount of time hearing about these

regulations, and their deliberation on this point was going to require the Court ensure that

they only give this evidence the weight that is permitted under the case law on this point.

The Defendants respectfully suggest that the jury was without an accurate and clear

statement of the law on this point to properly weigh the effect of this evidence in their

deliberations.

Pursuant to the authority cited in the Defendants' proposed jury instruction on this issue, and that authority brought to the Court's attention at side bar immediately following the conclusion of the Court's jury charge, Massachusetts case law has addressed the weight that juries should - and should not - give to evidence of the claimed violation of a rule or regulation, and have made clear that if a violation is found, then it may only serve as *some* evidence of negligence.  Specifically, Defendants requested the jury be charged on this issue to the effect that:

> If you find that any applicable regulation was violated, you may, but are not required to, consider such violation as some evidence of negligence. A violation of a statute, ordinance or regulation is, however, not conclusive on the issue of civil liability.  *Gallagher v. Turner Construction Co.,* 55 Mass. App. Ct. 1107 (2002); *See also LaClair v. Siberline Mfg. Co.*, 379 Mass. 21, 28 (1979); *Follansbee v. Ohse,* 293 Mass. 48, 52 (1935).

The instruction given by the Court stated that a violation, "although not conclusive, is evidence of negligence…," thereby giving the jury seemingly conflicting statements: evidence of a violation is both (1) not conclusive of civil liability, but (2) it <u>is</u> evidence of negligence.  Following the jury charge defense counsel at sidebar requested clarification for the jury on this point, specifically citing authority in addition to that identified in Defendants' requested instructions, standing for the premise that violations of a statute or regulation do not constitute "…negligence per se; they are only some evidence of negligence." *St. Germaine v. Pendergast*, 411 Mass. 615, 620 (1992), citing *McDonald v. Ortho Pharmaceutical Corp*., 394 Mass. 131, 139-140 (1985); *LaClair v. Silberline Mfg. Co*., 379 Mass. 21, 28 (1979); *Perry v. Medeiros*, 369 Mass. 836 841 (1976).  The Court's instruction on this point failed to embody the clarity and precision of the above-cited authority, and the jury was left to consider a statement concerning the

effect of this important evidence that did not instruct them properly in how to weigh evidence of a violation and there is a substantial risk that the jury in fact did find, contrary to law, violations of the several regulations at issue to be negligence *per se* or conclusive on the issue of the Defendants' liability. Accordingly, the Defendants have been materially prejudiced and request a new trial.

### D. The Court Incorrectly Permitted Plaintiff To Submit As Evidence State And Municipal Regulations Concerning The Service Of Alcohol.

The Defendants were materially prejudiced by the Plaintiff being permitted to introduce into evidence state and municipal regulations concerning the sale and service of alcohol, and the related operation of those facilities, despite the fact the Court allowed Defendants' Motion for Partial Summary Judgment concerning Plaintiff's claim of negligent service of alcohol, which had the effect of removing all allegations of negligent service of alcohol from the case, as a matter of law. (See Doc. No. 52, filed 3/2/12 and Doc. No. 121, filed 10/04/12). The introduction of this evidence created jury confusion on the issue of whether Plaintiff's claim for negligence could be proven by evidence concerning service of alcohol, though any such evidence was wholly irrelevant to the jury's consideration of Plaintiff's negligence claim, as no claim for negligent service of alcohol was pending against the Defendants at the time of trial. The Plaintiff's introduction of the subject of negligent service of alcohol, and specifically these regulations, conflated the theories of negligence and negligent service of alcohol, leading to jury confusion, and resulting in material prejudice to the Defendants.

The regulations offered into evidence by the Plaintiff, over Defendants' objections, were promulgated by the Massachusetts Alcoholic Beverage Control Commission (ABCC), and the City of Boston Licensing Board (Licensing Board), the

City of Boston entity responsible for regulating the sale and service of alcohol by entities licensed to serve alcohol in the City of Boston.  These regulations are wholly irrelevant in a trial with only a claim of negligence – not negligent service of alcohol – as the theory of liability.

On March 2, 2012 the Defendants filed a Motion for Partial Summary Judgment, identified as Document No. 52, with a corresponding Memorandum identified as Document No. 57, seeking to dismiss Plaintiff's claims against Defendants sounding in negligent service of alcohol.  Plaintiff filed an Opposition to said Motion (Document No. 67), to which the Defendant filed a Reply (Document No. 69).  The Defendants were heard on their Motion on March 6, 2012 and on October 3, 2012, following which the Court issued an Order granting the Defendants' Motion for Partial Summary Judgment (See Document No. 120), dismissing the Plaintiff's claims for negligent service of alcohol in their entirety.  The Defendants subsequently, in a motion in limine in advance of trial, requested this Court issue an Order (1) precluding all parties and witnesses from claiming that alcohol played a role in giving rise to the subject altercation in any way; (2) precluding all parties and witnesses from in any way referencing the regulations promulgated by the Alcoholic Beverage Control Commission and the Licensing Board of the City of Boston pertaining to the service of alcohol; and (3) precluding all parties and witnesses from referencing any regulation promulgated by the Mayor's Office of Consumer Affairs and Licensing that in any way concerns or references the sale or service of alcohol, or the presence of alcohol on a licensed premises.

As the Defendants' Motion for Partial Summary Judgment was granted, dismissing the Plaintiff's claims for negligent service of alcohol as a matter of law, the

questions of whether or not any patron was over-served alcohol at Sonsie on the night in question, and whether any such alleged over-service of alcohol was causally related to the Plaintiff's altercation with Victor Torza and Garrett Rease after the men left Sonsie, were wholly irrelevant to any issue remaining to be resolved by a jury.  As stated above, the Plaintiff's attorney referenced these regulations every day of trial, with every witness employed by Newbury Fine Dining, Inc. and Lyons Group, Ltd.  Reference to the subject of alcohol service, and to any of the regulations identified above, only served to cause undue prejudice to the Defendants, and jury confusion, as the jury may inadvertently have come to believe that service of alcohol is in some way relevant to the Plaintiff's altercation and the Plaintiff's claim for negligence.  Allowing reference to the service of alcohol and the aforementioned regulations caused unnecessary confusion of issues for the jury's consideration, and therefore, under Fed.R.Evid. 403, Plaintiff should have been precluded from referencing these regulations in any way at the time of trial.  Not precluding this evidence rendered the Court's decision to dismiss the negligent service of alcohol claim meaningless, as the jury could have considered this evidence as relevant in their deliberations on whether a claim for negligence was proven by Plaintiff's near constant reference to said evidence.

The significance to the case of referencing these regulations and of referencing service of alcohol generally, was abundantly clear prior to the time of trial.  Leading up to the Court's Order set forth in Document 120, the Plaintiff had devoted considerable time and resources to establish evidence on the issue of negligent service of alcohol, including the retention of a liability expert, James Staples, for the purpose of attempting to prove such service occurred at Sonsie on the night in question.  Numerous witnesses were

deposed and questioned on the topic of service of alcohol, as well, many of whom who were called to testify at the time of trial.  Given the importance of the subject prior to the Court's Order, the Defendants filed a motion in limine to prevent the exact prejudice that the Defendants ultimately suffered by the failure to exclude this evidence.  There existed a high potential for prejudice to the Defendants if the issues raised in Defendant's motion in limine were not resolved and understood by all parties and witnesses prior to the time of trial.

No question can be had that the Plaintiff relied heavily on the use of these alcohol regulations and references to negligent service of alcohol – Plaintiff's closing argument alone makes this point unequivocally clear wherein he made a blatant reference, unsupported by evidence, that Mr. Reiman may have been intoxicated, a further reason that he should have been ejected from Sonsie.  The jury was left confused and mislead by the introduction of this evidence and the Defendants respectfully request the Court take this last opportunity to undue this prejudice and grant the Defendants a new trial.

### E.   Plaintiff's Counsel Engaged In Impermissible Conduct During Trial, Through The Presentation Of Inflammatory Evidence, Thereby Prejudicing The Defendants And Warranting A New Trial.

The conduct of Plaintiff's counsel throughout the trial exposed the jury to highly prejudicial, often inadmissible conduct that was objected to by defense counsel throughout.  Now, with the jury having been distracted by this inflammatory conduct, the Defendants were substantially prejudiced, such that a new trial is warranted.

In assessing the effect of improper conduct by counsel, the Court must examine the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties

and the court treated the comments, the strength of the case, and the verdict itself.  *Santos v. Sunrise Med., Inc*., 351 F.3d 587, 593 (1st Cir. 2003), citing *Puerto Rico Aqueduct & Sewer Auth. v. Constructora Lluch, Inc.*, 169 F.3d 68, 82 (1st Cir. 1999). Introduction of purely emotional elements into the jury's deliberations is clearly prohibited conduct. *Smith v. Kmart Corp*., 177 F.3d 19, 26 (1st Cir. 1999), citing *Doty v. Sewall*, 908 F.2d 1053, 1059 (1st Cir. 1990) (citing *Polansky v. CNA Ins. Co*., 852 F.2d 626, 630 (1st Cir. 1988)).

Plaintiff's counsel engaged in conduct designed to distract the jury from focusing on the issues before them for resolution, presenting highly inflammatory comments and insinuations that painted the Defendants in a false light.  On direct examination of Patrick Lyons, an owner of the Defendant entities, Plaintiff's counsel referred repeatedly to hearsay statements contained in an article printed in Boston Magazine referring to alleged drug use by patrons at Sonsie, and went so far as to claim that staff at Sonsie were tipped with cocaine.  The statements contained in the article, which Mr. Lyons was presented on the witness stand, were clearly inadmissible hearsay as the source of this information quoted in the article was not Patrick Lyons, yet Plaintiff's counsel proceeded ahead parading this highly inflammatory hearsay from a gossip magazine in front of the jury, over the objections of defense counsel.  By the time the Court belatedly instructed Plaintiff's counsel to move on, the damage had been done and the jury had sat through a substantial line of questioning concerning this uncorroborated gossip, depicting the Defendant entities in an unfair and false light.  This commentary by the Plaintiff's counsel was repeated numerous times throughout the direct examination of Patrick Lyons, then brazenly raised again in his closing argument, immediately before the jury

deliberated.

Plaintiff's counsel went to great lengths to impermissibly skew the jury's impression of the Defendants by claiming that the Defendants intentionally withheld an incident report produced by one of Defendant's bartenders, Jessie Pray. Ms. Pray was questioned thoroughly on whether she in fact did complete such an incident report, and her answers were unequivocally clear – no she did not. Ms. Pray clarified a statement she had made prior to trial, having subsequently realized that she did not prepare an incident report for the subject event, but possibly for another, unrelated matter. Nonetheless, Plaintiff's counsel proceeded to repeatedly assail her with suggestions that she was not being forthcoming with the Court and that she was engaged with the Defendants in an attempt to cover up evidence of Sonsie's awareness on the night in question that Jeffrey Reiman had threatened members of the Plaintiff's group. As was his practice, Plaintiff's counsel then repeated these conspiracy theories in his examination of Defendants' employees during trial, and again in his closing statement, having no evidence that a cover up had taken place.

Plaintiff's counsel showed no restraint during his two-hour closing, during which he made wild allegations against defense counsel as well, telling the jury that during trial defense counsel had referred to the Plaintiff as "mentally retarded" – which the trial record shows clearly <u>did not happen</u>. It was Plaintiff's own counsel who had made that statement in his cross-examination of defense retained expert, Dr. Price, yet Plaintiff's counsel, acting with no regard to decency or professionalism, told the jury that defense counsel had made this slur about the Plaintiff. Further, that Plaintiff's counsel made a point to tell the jury that Mr. Chiulli and his girlfriend, Holly, were so offended by the

alleged comment, that they wanted Plaintiff's counsel to be sure to tell the jury they were so offended.  Despite the Defendants' timely objection, no action was taken by the court to cure the statement or even address the matter with the jury.  This reprehensible, last ditch attempt to create a prejudicial sideshow for the jury that would evoke an emotional response against the Defendants and defense counsel was squarely within scope of conduct that should be prevented by the Court.  Introduction of purely emotional elements into the jury's deliberations is clearly prohibited conduct.  *Smith v. Kmart Corp.*, 177 F.3d 19, 26 (1st Cir. 1999), citing *Doty v. Sewall*, 908 F.2d 1053, 1059 (1st Cir. 1990) (citing *Polansky v. CNA Ins. Co.*, 852 F.2d 626, 630 (1st Cir. 1988)).

Throughout trial, Plaintiff's counsel made repeated reference to highly prejudicial matters that had been specifically excluded from presentation to the jury by way of pre-trial motion practice.  The Defendants filed a successful Motion for Partial Summary Judgment prior to trial as to the Plaintiff's claim for negligent service of alcohol.  Despite the Court allowing Defendants' motion, removing the issue of negligent service of alcohol from the case as a matter of law, the Plaintiff made repeated reference to the service of alcohol throughout trial – including in his closing statement to the jury, during which he suggested that Jeffrey Reiman had been over-served and was intoxicated inside Sonsie.  Plaintiff's counsel was allowed to ask related questions in his examination of Mr. Reiman, despite such questions bearing no relevance, given the Court's summary judgment ruling.  Over Defendants' objections, the Court gave no curative instruction to the jury following Plaintiff's counsel's brazen disregard of the Court's ruling, thereby without question leaving the jury with the message that they were permitted to consider service of alcohol to the parties as a factor in whether they found that Plaintiff had

satisfied the required showing for proving a negligence claim – the only claim left

pending against the Defendants.  The Court gave no curative instruction to the jury on

this point, and the Defendants were prejudiced.  This matter had been thoroughly litigated

throughout the trial of the case and the Defendants succeeded in having it removed from

the case – until the Plaintiff's counsel was permitted to raise this issue during trial and

during his closing, despite the Court's ruling.

Plaintiff's counsel went on to tell the jury of Garrett Rease being criminally

charged as a result of this incident and that it was possible the Plaintiff could live well

beyond the life expectancy that his experts cited in their testimony. Nothing was held as

off limits for Plaintiff's counsel to present to the jury, and now the only way this harm

can be cured is with a new trial.

After weeks of trial, seeing the Plaintiff's counsel engaging in these disreputable

trial practices, the jury sat through two hours of Plaintiff's counsel's closing, where he

presented irrelevant, highly inflammatory information to the jury, targeted at nothing else

than evoking an emotional response from the jury, going so far as to compare Lyons

Group, Ltd. and Newbury Fine Dining, Inc. to BP and the Framingham Compounding

Center, both major news stories taking place during the trial of this matter.  Counsel

unabashedly took repeated, below the belt, pot shots, at the Defendants for reasons in no

way pertaining to a proper analysis of the actual issues in dispute pending before the jury.

As the Plaintiff's attorney was not stopped from engaging in this conduct, and as no

curative instructions requested by the Defendants were granted to correct the harm

identified herein, the only way the Defendants will not be the victim of a miscarriage of

justice is with a new trial.

### F. Evidence of the Felony Criminal Convictions of Joseph Citino, A Material Witness For The Plaintiff Should Have Been Admissible.

The Court, over the Defendants' objections, ruled *in limine* that the Defendants could not use evidence regarding the felony, criminal convictions of Joseph Citino, a material witness for the Plaintiff, to impeach his credibility and trustworthiness. Mr. Citino was a critical witness for the Plaintiff. His testimony spanned two days and systematically addressed many critical issues.

Mr. Citino's prior convictions at issue include:

(1)     Transfer and Delivery of Counterfeit Money in violation of Title 18, United States Code, Section 473 and Passing Counterfeit Money in violation of Title 18, United States Code, Section 472, case number H-87-75 AHN, United States District Court for the District of Connecticut. (See Attached **Exhibit "A"**); and

(2)     Sale of Stolen Firearms and Aiding and Abetting the Sale of Stolen Firearms in violation of Title 18, United States Code, Sections 922(j) & 924 & 2, case number H-87-44 MJB, United States District Court for the District of Connecticut. (See Attached **Exhibit "B"**).

Given the fact that the Plaintiff himself did not testify, the testimony of Mr. Citino carried that much more weight. Mr. Citino was one of only three witnesses from the Plaintiff's group of friends that were with the Plaintiff on the night of June 19-20, 2008, and appeared at trial to give the jury their account of the events of that evening. Further, the trial of this matter lasted nearly a month. The jury heard 15 days worth of testimony from many fact and expert witnesses. There was very little evidence, other than the oral testimony of witnesses, to demonstrate for the jury how the fight on the street which resulted in the Plaintiff's injuries actually occurred.

Mr. Citino gave a systematic account of the Plaintiff's actions on the night in question and also testified in detail about the acts and omissions of Sonsie employees and the acts of the co-Defendants Rease, Torza, and Reiman.  While the co-Defendant Rease and independent witness Owens testified that the Plaintiff was the initial aggressor in the altercation, which brought about the present action, Mr. Citino, alleged the Plaintiff was the victim in the altercation.  Given the jury allocated only 5% comparative negligence to the Plaintiff it is reasonable to infer the jury believed, and found credible, Mr. Citino's account of the night in question, versus the testimony of Sonsie employees and Rease, Torza, Owens, and Reiman, which contradicted Mr. Citino.

Indeed, the credibility of the fact witnesses constituted a significant component of evidence.  Denying the jury the opportunity to have a full understanding of Mr. Citino's past relevant, criminal history prevented them from having a complete portrait with which to decide whether to believe Mr. Citino's version of the events that transpired on the night in question and how much weight to give his testimony.  Denying the jury the ability to fully appreciate Mr. Citino's veracity and character for truthfulness substantially prejudiced the Defendants and warrants this Honorable Court granting a the Defendants' Motion for a New Trial.

    *v.*    *<u>Pursuant to Federal Rules of Evidence, Rule 609, Evidence of Mr. Citino's Felony Convictions Should Have Been Admitted.</u>*

More than 10 years has elapsed since Mr. Citino's release from confinement as a result of his two felony convictions.  Nevertheless, the probative value of evidence of the convictions, supported by specific facts and circumstances of this case, substantially outweighed any potential prejudicial effect because the convictions are for crimes that smack of deceit and dishonesty, which substantially bear on Mr. Citino's credibility and

trustworthiness as a witness for the Plaintiff.  Thus, evidence of the prior convictions should have been admissible for impeachment purposes to demonstrate the untruthful character of Mr. Citino.  As the Advisory Committee Note to Federal Rule of Evidence 609 makes clear, "Although convictions over ten years old generally do not have much probative value, there may be exceptional circumstances under which the conviction substantially bears on the credibility of the witness."  This is one of those exceptional circumstances.

Under Federal Rules of Evidence, Rule 609(b), Mr. Citino's convictions should have been admissible to impeach Mr. Citino's character for truthfulness while he testified.  Both of Mr. Citino's convictions involved crimes of deceit, honesty, and veracity.  Evidence of these convictions bears substantially on Mr. Citino's credibility and should have been admissible at trial because the probative value of such evidence substantially outweighed its prejudicial effect and proper notice of the intent to use the convictions was given.

> vi.  *The Probative Value of Admitting Evidence of Mr. Citino's Convictions Substantially Outweighed Any Potential Prejudicial Effect.*

Under Rule 609(b) a court must consider a number of factors including the nature, age, and severity of the prior conviction and its relevance to the witness' credibility, the importance of credibility as an issue in the case, the availability of other means to impeach the witness, and whether the witness has engaged in similar conduct recently. *Daniels v. Loizzo*, 986 F.Supp. 245 (S.D. N.Y. 1997).  Here, Mr. Citino's convictions were for crimes that resonate to the core of honesty and truthfulness, they were severe, federal, felony convictions for which Mr. Citino was incarcerated in federal prison, they would be extremely relevant to the jury weighting Mr. Citino's credibility as a critical,

material witness, credibility was a central issue to the case, and there existed no other means by which to impeach Mr. Citino's credibility.

In *Thomas*, the District Court admitted evidence of a witness' past conviction and the Eighth Circuit affirmed the admittance because credibility of witnesses in the case was paramount, the risk of unfair prejudice was minimal because the witness was not the Defendant, and the court gave a limiting instruction to curb the potential for prejudice, permitting the jury to use evidence of the witness' prior conviction "only to help you decide whether to believe the witness and how much weight to give his testimony." *United States v. Thomas*, 914 F.2d 139, 143 (8th Cir. 1990).

(a) Crimes of Dishonesty Bearing on Character for Veracity of Witness

Under Rule 609(b), "the pivotal issue of the probative value of a conviction turns largely on a consideration of the nature of the conviction itself". *United States v. Cavender*, 578 F.2d 528, 534 (4th Cir. 1978). Here, evidence of Mr. Citino's prior conviction should have been admissible, because the convictions for counterfeiting and trafficking stolen firearms bear centrally on the issue of whether jurors should have believed Mr. Citino and rest on a foundation of dishonest conduct, or involve elements of deceit, untruthfulness, or falsification. See *United States v. Cavender*, 578 F.2d 528, 534 (4th Cir. 1978) (compiling cases) (holding conviction must rest on dishonest conduct, or involve some element of deceit, untruthfulness, or falsification).

Mr. Citino's prior convictions are both crimes of dishonesty, fraud, falsification, and deceit and reflect an element of moral turpitude. Under Rule 609(a)(2), counterfeiting is expressly listed as a crime of dishonesty. See *United States ex rel. Volpe v. Smith*, 289 U.S. 422, 423 (U.S. 1933) (counterfeiting is plainly a crime involving

moral turpitude); *United States v. Morrow*, 977 F.2d 222, 228 (6th Cir. 1992) (finding a conviction for counterfeiting is a crime involving dishonesty or false statement under Federal Rules of Evidence 609).

Additionally, Mr. Citino's firearms convictions also evidence the dishonest conduct of Mr. Citino because these convictions involved the sale of *stolen* firearms and aiding and abetting the sale of *stolen* firearms and should have been admitted as impeachment evidence.  The Advisory Committee recognized that "[h]istorically, offenses classified as *crimina falsi* have included only those crimes in which the ultimate criminal act was itself an act of deceit."  Inherent in selling stolen goods is the intent to deceive a buyer that such goods are legitimate or openly ignore the fact that such goods are illegitimate, which demonstrates a lack of veracity and classifies this offense as *criminal falsi.*

Since Mr. Citino's prior convictions were both probative on the issue of his trustworthiness, which was the pivotal issue for balancing the probative value versus potential prejudice, they should have both been admitted as impeachment evidence.

(b)  Credibility of Witness is Paramount in the Matter at Hand

In cases such as this, where the credibility of one witness must be weighed directly against that of another, the probative value of a prior conviction is enhanced for purposes of a Rule 609(b) determination.  *United States v. Spero*, 625 F.2d 779, 782 (8th Cir. 1980).

The conviction evidence is particularly probative in this case because Mr. Citino's credibility, as a percipient witness to the events at hand, was a critical issue.  As stated above, the trial of this matter lasted nearly a month with 15 days of testimony.  Witnesses

gave contradictory accounts of how the altercation actually occurred.  The credibility of the fact witnesses constituted a significant component of evidence.  However, by denying the jury the opportunity to have a complete understanding of Mr. Citino's past history it prevented them from having a full portrait with which to decide whether to believe Mr. Citino's version of the events that transpired on the night in question and how much weight to give his testimony.

> (c)  <u>Mr. Citino Was a Fact Witness Not Criminal Defendant Thus The Prejudicial Effect of Introducing Evidence of His Felony Convictions is Diminished.</u>

The Congressional history of Rule 609 dictates that implicit in balancing of probative value of evidence of prior convictions versus the potential prejudicial effect is recognition of the fact that danger of unfair prejudice is far greater when a criminal Defendant, as opposed to a fact witness in a civil case, such as Mr. Citino, testifies.  This is because the jury may be prejudiced as to the ultimate issue of a criminal Defendant's guilt or innocence if they know of his prior criminal history.  In contrast, the Fifth Circuit found: "[t]he danger of prejudice to a nondefendant witness was rejected altogether as a consideration in the balance in favor of allowing the trier of fact to have as much relevant evidence on the issue of credibility as possible."  *Untied States v. Martinez*, 555 F.2d 1273, 1275 (5th Cir. 1977).

Here, the jury deserved to have as much relevant evidence on the issue of Mr. Citino's credibility as possible, and the danger of prejudice to Mr. Citino, should have been rejected.  Further, the First Circuit has adopted the view that "the standard for the admission of prior convictions of the accused is stricter than the standard for the admission of prior convictions of a government witness."  *United States v. Tse,* 375 F.3d

148, 163 (1st Cir. 2004).  Like the Fifth Circuit in *Martinez*, the *Tse* Court distinguished criminal Defendants from fact witnesses in holding prior convictions of fact witnesses are more easily admissible than those of criminal Defendants because the potential prejudice to a witness from the admission of a prior conviction is not as great at the potential prejudice to an accused.  *Id*.

The matter at hand involved a civil suit for money damages as a result of a fight. There were no pending criminal charges against the Plaintiff or Mr. Citino relative to this incident.  Further, Mr. Citino's past convictions do not bear similarity with the matter at hand.  Mr. Citino's prior convictions are probative to his veracity, not his propensity to fight.  Thus, it would have been unlikely for the jury to make a prejudicial inference that because Mr. Citino had past convictions demonstrating dishonesty he was likely to be involved in a physical alteration.  Thus, because Mr. Citino was a fact witness, not a criminal Defendant, evidence of his prior, felony convictions should have been admitted because the potential prejudice to a merely fact witness is not great.  Evidence of Mr. Citino's past convictions would have only assisted the jury in making a determination whether to believe Mr. Citino's testimony or not and served to allow the jury to properly assess his credibility and as such they should have been admissible.

### vii. Proper Notice Of The Defendants' Intent to Use Citino's Convictions Was Given

The Plaintiff made gross misrepresentations in his Motion In Limine to Preclude Evidence of Past Crimes of Joseph Citino by arguing that the Defendants did not provide Plaintiff with proper notice of their intent to use Mr. Citino's convictions as impeachment evidence and as a sanction for his lack of candor to this tribunal the Plaintiff's Motion should have been denied.  In his Motion, Plaintiff stated: "Plaintiff's counsel has not been

notified in writing of the date of the conviction, the jurisdiction, or the offenses involved."  (See Plaintiff's Motion to Preclude, Document 103, Page 4).  However, as the Defendants argued in detail in their opposition to the Plaintiff's Motion in Limine, on four separate occasions, the Plaintiff was informed, in writing, of the Defendants' intent to use Mr. Citino's criminal convictions as impeachment evidence and was even provided with copies of the actual criminal judgments and indictments.

The Defendants not only complied fully with Rule 609(b)(2)'s notice requirement, but went well above and beyond it.  The Plaintiff's claim to the contrary was a complete misrepresentation being foisted upon the Court in violation of Rule 11 and was so egregious in and of itself that it warranted denial of the Plaintiff's Motion in Limine on that basis alone.

Because the Court's rulings erroneously precluded the use of evidence relevant to the credibility and trustworthiness of a material witness for the Plaintiff the Defendants are entitled to a new trial.

### G. The Defendants Were Prejudiced By The Court's Decision To Not Impose Sanctions Against Plaintiff As A Result Of Plaintiff's Counsel's Destruction of Material Evidence Used To Prepare Two Material Witnesses For Their Depositions.

The Defendants were prejudiced by the Plaintiff's counsel's destruction of evidence he used to prepare two material witnesses for their depositions, and further prejudiced by the Court's decision not to cure the harm caused by this destruction, through the imposition of sanctions against Plaintiff and/or negative inference instructions to the jury.

On October 4, 2012 this Court issued a ruling set forth in Document 120, concerning the Defendants' Motion to Compel Compliance with Court Orders and to

Provide Complete Responses to Discovery, identified as Document Number 55, attached

hereto as "**Exhibit C**".  As set forth in the attached transcript of the Pre-Trial Conference

on March 6, 2012 (See **Exhibit "D"**), prior to the Court's Order of October 4, 2012, the

Court had already found that the Plaintiff's destruction of a written timeline used to

prepare two witnesses prior to their depositions constituted spoliation and that the jury

was to be instructed they may draw a negative inference against the Plaintiff as a result of

said spoliation.  As the Court's order of October 4, 2012 is inconsistent with its ruling at

the March 6, 2012 Pre-Trial Conference, the Defendants requested this Court reconsider

its Order of October 4, 2012 in advance of trial, and reinstate the previous ruling and

instruct the jury that they may draw a negative inference against the Plaintiff as a result of

the document destruction set forth above.  As the Court denied Defendants' request to

reconsider its ruling and impose the requested sanctions, the Defendants were materially

prejudiced at the time of trial and now request the Court undue this harm and grant

Defendants a new trial.

        In Document 55, the Defendants requested this Court find spoliation as a result of

Plaintiff's intentional or negligent destruction of a document used by Plaintiff's counsel

to prepare two crucial witnesses, Robert Deliseo and Joseph Citino, for their depositions

in this case. The document at issue was a timeline prepared by Plaintiff's counsel

outlining the series of events that transpired on the night of Plaintiff's altercation that was

viewed by both witnesses during meetings with Plaintiff's counsel in advance of their

depositions.  In Document 55, the Defendants requested the Court, at a minimum, order

that the jury be instructed that they can draw a negative inference against the Plaintiff as a

result of the spoliation of this crucial evidence.  Given the gravity of the prejudicial

impact the destruction of this document had on the Defendants' ability to effectively cross-examine these two crucial witnesses, the Defendants maintain, just as stated in Document 55, that the most appropriate sanction for this spoliation was to preclude Mr. Deliseo and Mr. Citino from giving testimony as to the liability issues in this case.

The Defendants submit that it is clear, based upon the transcript of the Pre-Trial Conference on March 6, 2012, when read as a whole, that this Court agreed that there had been spoliation, that the Defendants' request for a negative inference instruction was granted, and that the only remaining issue was the content of said instruction. (See attached "**Exhibit D**" – Pre-Trial Conference Transcript, at Page 3 Line 16 through page 16 Line 15). To that end, the Court invited defense counsel to submit proposed language of such an instruction, and also permitted the Plaintiff, who argued that the spoliation was not purposeful, but inadvertent, to submit an affidavit to the Court explaining the circumstances of the destruction of the document, to the extent same had a bearing on the nature of the sanction to be imposed – not whether there would be a sanction. The Defendants subsequently submitted their Response to Plaintiff's affidavit and a proposed negative inference jury instruction on March 27, 2012, identified as Document Number 66.

Inconsistently with what transpired at the Pre-Trial Conference, the Defendants respectfully submit, during the hearing on October 3, 2012, the Court indicated that it had not found spoliation to have occurred and, through its order dated October 4, 2012, set forth in Document 120, the Court had indicated, in sum, that no spoliation had been found concerning the destruction of the aforementioned document, and that no negative inference instruction would be given to the jury. Accordingly, and as set forth more fully

herein, the Defendants respectfully suggest that the Plaintiff's destruction of the subject timeline does in fact constitute spoliation of an important document, and that the Defendants, being irreparably prejudiced thereby, were entitled to have a negative inference instruction given to the jury at the time of trial.  The document or documents, timelines developed by Plaintiff's counsel, were utilized by Mr. Deliseo and Mr. Citino, two friends of the Plaintiff with him at Sonsie on the night in question and critical liability witnesses, to prepare for their depositions.  Without those timelines, the Defendants were hamstrung in their cross–examination of these two witnesses at trial because it could not be determined how much of their testimony came from their own, unadultered memories and observations, as opposed to what may have been fed to them or suggested to them by someone who was not even there.

The Defendants urge the Court to remember that in their original filing, Document Number 55, the Defendants pointed out that the version of the timeline that was finally produced by the Plaintiff after multiple Court orders went unobeyed, had hand written notations on it to the effect that "I didn't say that" and "I don't remember that", confirming the suspicion that some of their deposition testimony, and, presumably their trial testimony, was untrue.  Again, without the version of the timeline that was actually used to prepare these witnesses, the Defendants were never able to know, and therefore never able to effectively cross-examine these witnesses, leading to substantial prejudice.  The only way to attempt to offset some of that prejudice, other than having banned these witnesses from testifying at trial, was to do what the Defendants submit the Court indicated at the Pre-Trial Conference it was going to do: impose the sanction of a negative inference instruction.

The Court agreed with the Defendants that the chronology(ies) needed to be produced, recognizing their potential important role in the truth-seeking process that was supposed to be the trial of this matter, and has further agreed that destruction of said evidence constituted spoliation, as set forth in the attached transcript.

Consistently with the Court's March 6, 2012 order at the Pre-Trial Conference, as set forth in the attached transcript of said Conference, the Defendants proposed in their Motion for Reconsideration on the issue of spoliation that at an appropriate point in the trial of this matter, the Court give the jury the following negative inference instruction regarding the testimony of Mr. Deliseo and Mr. Citino, as well as any expert testimony that may be denied from their testimony.

The Defendants' proposed form of instruction was as follows:

You have heard (or are about to hear) testimony from two companions of the Plaintiff, Robert Deliseo and Joseph Citino.

Before trial, these two witnesses gave sworn testimony about the incident in what is known as depositions.  Before their depositions, these two witnesses met on more than one occasion with Plaintiff's counsel and reviewed a chronology of events of the night in question.  That chronology was created primarily by Plaintiff's counsel based on what he claimed he noticed in the surveillance videotape from Sonsie for the night in question. The chronology or chronologies that Mr. Deliseo and Mr. Citino looked at were destroyed or lost by Plaintiff's counsel and cannot now be reproduced to defense counsel, despite two orders of this Court to do so.

Accordingly, I instruct you that you may draw an inference against the Plaintiff, from the loss or destruction of the chronology (ies) reviewed by Mr. Deliseo and Mr. Citino, that had these documents been preserved and made available to defense counsel and to you the jury, they (1) would have contained information that shows that facts, not based on their personal knowledge, were suggested to these witnesses that were then incorporated into their testimony; (2) would have contained information which shows that one or both of these witnesses' testimony at deposition and here at trial is untrustworthy because it is not based on their own memories or observations; and (3) would have contained information that is unfavorable to the interests and claims of the Plaintiff in this case.

The denial of the requested spoliation finding and any related instruction(s) to the jury resulted in material prejudice to the Defendants.  To undo the harm caused by the destruction of the aforementioned evidence, and the subsequent adverse ruling concerning imposition of sanctions, the Defendants respectfully request this Honorable Court grant Defendants a New Trial.

### H. The Testimony and Life Care Plan of the Plaintiff's Rehabilitation Expert William Burke Concerning the Medical Needs of the Plaintiff Lacked the Requisite Medical Foundation and Should Have Been Precluded.

The Court, over the Defendants' objections, denied the Defendants' Motion in Limine to Preclude Plaintiff's Expert William Burke From Testifying (See Doc. Nos. 136 and 170) and improperly allowed Mr. Burke to testify outside the scope of his expertise. The Court also, over the Defendants' objection, admitted Mr. Burke's "Rehabilitation and Life Care Plan" into evidence.

A new trial is warranted here because allowing Mr. Burke to testify concerning the Plaintiff's medical needs and admitting his Life Care Plan into evidence without the proper foundation and qualifications imposed significant prejudice upon the Defendants. The Plaintiff called Mr. Burke to testify regarding the Life Care Plan he prepared specifically for this litigation.  (See Attached **Exhibit "E"** – Life Care Plan).  Mr. Burke's testimony and his Life Care Plan detailed the Plaintiff's future medical needs; however Mr. Burke is not qualified to give such testimony.

Mr. Burke testified he is a rehabilitation counselor, not a medical doctor.  Mr. Burke testified he is not qualified to write prescriptions or prescribe a particular course of treatment.  As a rehabilitation counselor he is not qualified to offer expert opinions about the Plaintiff's present or future need of medical treatment, as he did at trial, without those

needs first being prescribed by a medical doctor, which they were not.  No medical doctor testified or wrote any report concerning the medical needs of the Plaintiff or the amount of in-home health aid services that the Plaintiff required now or in the future.  In this case, no medical doctor, nor expert report, set forth the medical needs of the Plaintiff.  Mr. Burke testified he did not consult with any of the Plaintiff's treating physicians, past physicians, or even the neurological expert, Dr. Benson, hired by the Plaintiff for the purpose of this litigation when developing his Life Care Plan.  Although Mr. Burke did testify that it is best practice to consult with the treating physicians of a client when developing a Life Care Plan, he did not do so in this case.  Nor did he consult with Dr. Benson or any other physician as to the Plaintiff's medical needs, despite his admitting that it was his usual protocol to do so.

There is no medical basis to specifically link what Mr. Burke alleged the Plaintiff required as outlined in his Life Care Plan, with the Plaintiff's actual medical needs as documented by his doctors.  Mr. Burke failed to base his life care conclusions on actual medical diagnoses and requirements contained in the Plaintiff's medical records and because Mr. Burke is not a medical doctor himself, he is unqualified to make such determinations.  Mr. Burke testified he did not consult with any of the Plaintiff's treating physicians when developing his Life Care Plan.  By relying only his own opinion, not grounded in medical documentation about the Plaintiff's current and future medical needs, Mr. Burke slides down a slippery path of guesswork, surmise, and conjecture in suggesting that the Plaintiff requires medical services and treatment not deemed necessary by his own physicians.

The improper admission of expert evidence and testimony is held to warrant a

new trial where such evidence inflicts unfair surprise or other prejudice upon another party.  See *Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 283-84, 286-88 (1st Cir. 1993) (improper admission of previously undisclosed expert's testimony was abuse of discretion warranting new trial); *Nimely v. City of New York*, 414 F.3d 381, 393-400 (2nd Cir. 2005) (prejudice caused by improper admission of expert testimony regarding witnesses' credibility warranted new trial); *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790-91 (6th Cir. 1989) (District Court did not abuse discretion by granting new trial upon determining that it improperly had permitted expert to testify outside scope of his expertise).

In *Logan*, *supra*, the Sixth Circuit found the District Court properly granted the Defendants' Motion for a New Trial on the grounds that the Plaintiff's chiropractor testified beyond the scope of his expertise.  *Logan v. Dayton Hudson Corp.*, 865 F.2d at 790-91.  There, the Plaintiff's chiropractor testified that he was not licensed to perform surgery or give a diagnosis on whether surgery would be required by a patient.  *Id*. at 790. However, the chiropractor gave trial testimony that the Plaintiff would require back surgery and the Plaintiff's closing argument made references to the chiropractor's testimony that the Plaintiff's injury would require surgery in the future.  *Id*. at 790-91. The Sixth Circuit found the District Court did not abuse its discretion in granting a new trial, reasoning that the chiropractor's testimony gave an opinion to the jury beyond the scope of his qualified expertise and there was substantial prejudice to the Defendants as a result.  *Id*. at 791.

Similarly, here, Mr. Burke's testimony exceeded the scope of his expertise because he is not a medical doctor.  Mr. Burke testified he is not qualified to prescribe

medications or treatments.  However, Mr. Burke's Life Care Plan set out specific treatments and needs of the Plaintiff, to which no medical doctor actually testified the Plaintiff required.  Thus, like the court found in *Logan*, here, a new trial is warranted because Mr. Burke's testimony and Life Care Plan presented evidence to the jury that was beyond the scope of his qualified expertise and there was substantial prejudice to the Defendants as a result.

Mr. Burke simply offered a "bottom line conclusion" that the Plaintiff requires substantial medical care and services and can never work again.  Simply offering a bottom line conclusion, unsupported by research or facts presented to the Court is unacceptable; as Judge Posner has put it, "an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."  *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989).  As stated above, as a rehabilitation counselor, Mr. Burke is not qualified to offer opinions of medical diagnoses or prognoses as to the Plaintiff's medical conditions and needs, and his "opinions" are not supported by the medical records or any medical testimony.  Thus, Mr. Burke lacks the necessary expertise to render this opinion and he should have been excluded from testifying and offering his Life Care Plan into evidence.  As a matter of law, Mr. Burke does not possess the requisite knowledge, skill, experience, training, or education to render either a diagnosis or prognosis of a medical condition.

The error in admitting the testimony and Life Care Plan of Mr. Burke, and its $1.4 million price tag, substantially prejudiced the Defendants and is proper grounds for a new trial.

**I.   The Plaintiff Improperly Cross Examined the Defendants' Economist Using A Document Not In Evidence and Refused To Give A Curative Instruction To The Jury, Resulting In Irreparable Harm To The Defendants.**

The Defendants filed a Motion to Strike portions of the cross-examination of Defendants' economist, Dr. Harold Petersen, and moved for a curative jury instruction, as the Plaintiff inaccurately represented what information a jury may consider in calculating Plaintiff's future loss of earnings, and in doing so, showed the jury a page from a document not in evidence. (See Doc. No. 226, Filed 11/13/12).  During Attorney Baker's cross-examination of Dr. Petersen, a page from Dr. Hewins' report, not in evidence, was, over Defendants' objection, placed on the document presenter and displayed to the jury. That page contained an excerpt from a 1915 Massachusetts Supreme Judicial Court case, *Mahoney v. Boston Elevated Railway*, which, according to Attorney Baker's cross-examination, held that the approach Dr. Petersen had utilized to calculate the Plaintiff's future loss of earnings was outlawed by that decision.  Dr. Petersen, the Court will recall, had based his calculations upon the actual historical earnings of the Plaintiff's business from 2002 – 2007 and his "income" as determined by the Social Security Administration for the same period.  Over repeated objection by Defendants, the jury was left with the distinct impression that for a self-employed person such as the Plaintiff, it is never appropriate to consider the net earnings of his business as reported on Schedule C for his federal tax returns.  Attorney Baker's questioning of Dr. Petersen in this regard was premised on his interpretation of the *Mahoney* case, which was that potential earnings of persons in similar trades or professions, hypothetically working for a company as a W2 employee, was the only accepted method to calculate the Plaintiff's future loss under Massachusetts law.  However, it remains abundantly clear that the excerpt from the

*Mahoney* case cited in Dr. Hewins' report and shown to the jury presented only half of the guidance offered by the S.J.C. in the *Mahoney* case.

A full read of that decision makes clear that any valuation of Plaintiff's claimed loss of earning capacity would properly include consideration of the figures reported on Schedule C of Plaintiff's tax returns, as Dr. Petersen advocated. At trial, the Defendants' Motion to Strike was allowed in part and denied in part. The Court instructed the jury to disregard the image of Dr. Hewins' report displayed to the jury on the document projector, but denied the Defendants' Motion to Strike portions of the cross examination of Dr. Peterson. The Defendants request for a curative jury instruction was also denied. (See Doc. No. 231, Filed 11/16/12).

Accordingly, the jury was left to consider this important question using incorrect information to calculate a damage figure for the Plaintiff and further left believing the information presented by Dr. Petersen was to be considered inaccurate, and therefore, discredited. The Defendants now request the Court grant a new trial to undo the harm caused.

The Defendants maintain that the enactment of the Social Security Act, subsequent to the *Mahoney* decision, changed the definition of what constitutes "personal income" and therefore, the process for calculation of future loss under *Mahoney* has been rendered null and void. However, to the extent the Court credits the *Mahoney* decision as still applicable today, the *Mahoney* decision does, in fact, call for consideration of net earnings from a self-employed business under the facts of this case. In *Mahoney,* the S.J.C. stated an analysis to be made in calculating a loss of earning capacity for persons who are self-employed at the time they sustain a personal injury. The S.J.C. plainly

stated that:

> [W]here the element of personal expertness [sic] is the essential and
> dominant factor and the capital invested is merely incidental to the
> individual capacity which is the fundamental cause of the income, then the
> income stands on the same basis as wages or salary and may be shown.
> *Mahoney v. Boston Elevated Railway*, 221 Mass. 116, 117 (1915).

The Plaintiff, as the principal of Eastern Development, LLC, which was

comprised essentially of him and occasionally, a laborer or two, provided the personal

"expertness" that resulted in the "fundamental cause of the income" produced by Eastern

Development, LLC. It was the Plaintiff who almost exclusively operated the heavy

machinery doing the excavating, not a staff of operators that he simply managed. The

Plaintiff admitted this in his videotapes interview with Dr. Price that was shown to the

jury.  What the S.J.C. has made clear in *Mahoney* is that where the Plaintiff was the

'essential and dominant' source of the skill and expertise sold or provided by the

business, and Plaintiff is not simply managing a staff that creates the business' profit, the

reported net income for that entity may be considered in evaluating the Plaintiff's

claimed loss of earning capacity. *Mahoney*, 221 Mass. at 117.

Accordingly, the Defendants have been prejudiced by the misstatement of law

given to the jury concerning the calculation of future loss of earnings, and by the denial

of Defendants' request that a curative instruction be given to the Jury.  The stakes were

not insignificant as Plaintiff's economist was permitted to provide an opinion of the

present value of the Plaintiff's loss of earning capacity in the $1.5 million range, while

Dr. Peterson, utilizing the actual profits and losses from the Plaintiff's business,

calculated $393,062 for a total lost earning capacity of the Plaintiff.  The Defendants

respectfully request this Court grant a new trial to undo this irreparable harm.

## III.  CONCLUSION.

WHEREFORE, for the reasons set forth above, the Defendants, Newbury Fine Dining, Inc., d/b/a Sonsie, and Lyons Group, Ltd., respectfully request this Honorable Court grant a new trial.

### DEFENDANTS' REQUEST FOR ORAL ARGUMENT

Under Local Rule 7.1(d), Defendants hereby respectfully request oral argument on their Motion for New Trial.  The Defendants believe that oral argument may assist the Court in ruling and wish to be heard.

Dated:  December 19, 2012

Respectfully Submitted,
The Defendants,
Newbury Fine Dining, Inc.,
and Lyons Group, Ltd.,
By their Attorneys,

/s/ H. Charles Hambelton
H. Charles Hambelton (218560)
Sharmili P. Das (646306)
BEHMAN HAMBELTON LLP
600 West Cummings Park, Suite 5600
Woburn, MA  01801
(781) 229-6667
hambelton@bhlawllp.com
sdas@bhlawllp.com

<u>CERTIFICATE OF SERVICE</u>

I, H. Charles Hambelton, do hereby certify that this document was filed through the ECF system, and notice will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 19, 2012.

Respectfully Submitted,
The Defendant,
The Lyons Group, Ltd.
By its Attorneys,


/s/ H. Charles Hambelton
H Charles Hambelton (BBO#218560)
Sharmili P. Das (BBO #646306)
BEHMAN HAMBELTON LLP
600 West Cummings Park, Suite 5600
Woburn, MA  01801
(781) 229-6667
(781) 229-2368 *(fax)*
hambelton@bhlawllp.com
sdas@bhlawllp.com